

02/21/2007

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NUMBER: 04-45468-R |
| NORMAN MICHAEL MILLER | § | CHAPTER 7 |
| AND SHERI PRATER MILLER | § | |
| aka MIKE MILLER, | § | |
| d/b/a M —CORP INTERNATIONAL | § | |
| TRUST, | § | JUDGE BRENDA T. RHOADES |
| | § | |
| DEBTORS. | § | |
| _____ | § | _____ |
| | § | |
| NEIL LEWIS AND SHARON | § | ADVERSARY NO: 05-04044 |
| LEWIS d/b/a S.D.I.C., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| NORMAN MICHAEL MILLER | § | |
| and SHERI PRATER MILLER, | § | |
| | § | |
| Defendants. | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

This matter is before the Court following the trial of the Complaint to Object to

Discharge, as amended (the "Complaint"), by Neil and Sharon Lewis d/b/a S.D.I.C.

(collectively, the "Plaintiffs") against Norman and Sheri Miller (collectively, the

"Defendants" or "Debtors").  In their Complaint, the Plaintiffs seek a judgment from this

Court that a pre-bankruptcy judgment against the Defendants is non-dischargeable

pursuant to 11 U.S.C. §§523(a)(2)(A), (a)(4) and/or (a)(6). Upon consideration of the

pleadings, the evidence presented, and the arguments made at trial, the Court makes the

following findings of fact and conclusions of law.

---

[1] These Findings of Fact and Conclusions of Law are not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, or the law of the case, or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

# FINDINGS OF FACT

1.      In or around 1969, Neal Lewis ("Lewis") formed a networking organization known as International Mergers and Acquisitions ("IMA").  IMA charges its members an initial membership fee as well as quarterly fees.  Members can attend training seminars and obtain referrals from other members for work in the area of the members' expertise.

2.      When an investment opportunity arises, IMA assigns a name to the project.  The IMA member that proposed the investment is usually the administrator for the project.  Lewis was the administrator for an investment project called "SDIC" (which was an acronym for the South Dakota Investment Club).

3.      Lewis formed the SDIC Partnership in April 1996.  Partners were to receive one vote for each $5,000 invested.  Lewis intended to raise money from IMA members and from non-IMA members to invest in various high yield investment programs.

4.      Lewis is not a sophisticated investor and does not have any special knowledge or experience regarding securities laws or high yield investment programs.  Lewis is not an investment banker.  He is not a licensed financial manager or stock broker, and he has no education and little or no experience in these areas of expertise.

5.      In or about October 1996, Lewis met Defendant Norman Michael Miller ("Miller") through one of Lewis' business contacts, Tom Battista.  Mr. Battista was a member of the IMA.  Mr. Battista sponsored Miller into the IMA.

6.      Unbeknownst to Lewis, Miller was running a Ponzi-type scheme.  Miller held himself out as a registered agent for the investment of funds and as the operator of a

business called M-Corp International, Ltd. ("M-Corp").  Lewis was unaware that Miller had been convicted of securities fraud and theft in Texas in 1991.

7.       In order to induce Lewis into investing in his Ponzi-type scheme, Miller fabricated an elaborate story about so-called contract trading programs ("CTP").  While the story appears nonsensical in hindsight, Lewis was deceived by Miller.

8.       During an initial meeting with Lewis, Miller discussed investing in a CTP which was being run by an individual named Tommy Jones.  Miller told Lewis that Jones was a childhood friend, and Jones and Miller spoke highly of each other to Lewis.  Miller described this particular CTP as a high yield loan program.

9.       Lewis raised $300,000 from investors and placed the funds with Jones for the purpose of investing in what Lewis believed was a high return loan program.  Miller pretended to join in the CTP as an investor and kept Lewis informed about the contract trades that were supposedly occurring.  When Jones appeared reluctant to distribute the promised profits to Lewis, Miller pretended to help Lewis negotiate with Jones.  Miller arranged for Lewis to receive all of his money back, with interest.

10.       In or about July 18, 1997, Miller brought Lewis another CTP to consider. Miller claimed that this latest CTP would involve multiple trades over the course of the program, with each trade yielding an anticipated 9.67% profit to be re-invested in the program.  Miller represented that, although SDIC was not a qualified investor, Miller could arrange for SDIC to "piggy back" on a qualified investor's investment.  Miller told Lewis that the amount of money that could be invested in the CTP was restricted to $300,000 but that Lewis might be able to increase SDIC's investment in the CTP in the future.  Miller was to receive a portion of SDIC's profits from the CTP as compensation.

3

11.     Based on his experience with Miller in connection with the prior CTP, Lewis agreed to invest in another CTP with Miller as his agent and advisor.  Lewis raised $300,000 from various acquaintances and IMA members to invest with Miller in the new CTP.  He transferred the funds to Miller's account at Wells Fargo in Plano, Texas, on July 30, 1997.  At that time, Miller's account was overdrawn by $76,923.53.

12.     Prior to transferring the $300,000 to Miller's bank, Lewis and Miller entered into a Private Placement Agreement.  Lewis executed the Private Placement Agreement by and on SDIC's behalf and Miller executed the Private Placement Agreement by and on M-Corp's behalf.  In addition, Miller and Lewis entered into a nondisclosure and confidentiality agreement.

13.     Miller told Lewis that strict confidentiality was necessary to protect the names of the traders and banks, to prevent disclosure of the information to nonqualified investors, and to prevent solicitation from nonqualified investors. Miller also explained that he could never disclose who his traders were and that Lewis could never know the trader's names.

14.     According to Miller, two separate bank accounts were necessary to allow the CTP program to operate.  Miller represented that the collateral bank would hold the investor's initial principal and convert it to a certificate of deposit or T-Bill.  Miller represented that the transacting bank, J.P. Morgan (Suisse) SA of Geneva, Switzerland ("J.P. Morgan Bank"), would hold the profits generated by the trades.  The nondisclosure and confidentiality agreement named M-Corp the paymaster of the profits generated under the Private Placement Agreement.

4

15.     After Lewis transferred the original investment of $300,000 to Miller's account, one of the investors demanded the return of his $50,000 investment.  Miller promptly wired $50,000 to SDIC.

16.     In or about October 1997, Miller informed Lewis that SDIC's investment could be increased to a total of $500,000.  Lewis transferred funds totaling $250,000 to Miller's Wells Fargo account on October 8-10, 1997.  Prior to those transfers, the balance in Miller's account was $70.96.

17.     On October 15, 1997, Miller represented the first contract trade under the current CTP had occurred.

18.     In December 1997, Miller informed Lewis that SDIC's investment could be increased to the total amount of $637,000.  Lewis raised additional funds from investors and wired $137,000 to Miller's Wells Fargo account on December 16, 1997.  Prior to that transfer, the balance in Miller's account was $67,427.21.

19.     In a letter dated November 11, 1997, Miller informed Lewis that he had formed a new corporation called Advisory & Consulting Invitational Group, Inc., for the U.S. operations of his trading business.  Miller also informed Lewis that he had set up a new corporation called Le Mans, Ltd., in the Turks & Caicos Islands.

20.     On December 15, 1997, Miller faxed Lewis a trading schedule which delineated the dates upon which actual trades would occur from January 1998 through May 1998.

21.     In March 1998, Miller informed Lewis that SDIC's investment could be increased to $1,659,000.  Lewis thereafter raised additional funds from investors.  On March 9, 1998, Lewis wired $722,000 to Miller's Wells Fargo account.  At the time of

that transfer, the balance in Miller's Wells Fargo account was $24,000.  Lewis wired an additional $300,000 to Miller's Wells Fargo account on March 18, 1998.

22.     On March 20, 1998, Miller faxed Lewis a trading schedule which delineated the dates upon which trades would occur for June through December 1998.

23.     In April 1998, Miller informed Lewis that SDIC's investment could be increased by an additional $500,000 to $2,159,000.  Lewis raised additional funds from investors and wired $500,000 to Miller's Wells Fargo account on April 13, 1998.

24.     In 1998, Lewis formed a company called NETGO, Inc., to be the administrator for the SDIC partners' investment in the CTP.  NETGO was owned by Neal and Sharon Lewis, and NETGO held powers of attorney for the SDIC partners.

25.     On or about April 20, 1998, Miller formed a company called Daylight, Ltd. ("Daylight") in the Turks & Caicos Islands.  An attorney named Hugh O'Neill represented Miller and assisted him in the formation of Daylight.  Daylight was to hold the SDIC partners' profits and to disburse funds as directed by NETGO.

26.     During 1997 and 1998, Lewis and Miller discussed placing SDIC's investments in a trust account.  Miller informed Lewis that a number of obstacles would make establishing such an account difficult.  Ultimately, Miller informed Lewis that it would not be possible to place SDIC's investments in a trust account.

27.     In August 1998, Lewis met with Miller at Miller's office.  Miller told Lewis that SDIC's principal was invested in two Certificates of Deposit, which had earned $324,000 in interest.  Miller showed Lewis what appeared to be copies of two Certificates of Deposit from the Bank of Nova Scotia, representing the $2,159,000 investment.  In addition, Miller showed Lewis what appeared to be authentic bank

6

statements for the account holding the profits from the CTP. These statements showed that SDIC's had earned $20,222,670 in profit. Miller did not allow Lewis to make copies of the bank statements.

28.     In reliance on Miller's representations and documents, Lewis updated the SDIC investors regarding his meeting with Miller in a memorandum dated August 13, 1998. Lewis informed the investors that they could elect to terminate their participation in the CTP at the end of 1998. If they made that election, principal and interest earned on the CDs and profits from the CTP would be distributed in January 1999. Lewis informed investors that, alternatively, they could elect to continue in the program through 1999. Lewis also informed investors that they could add to their investment on or before August 20, 1998.

29.     All of the SDIC investors voted to stay in the program through 1999 with quarterly disbursements.

30.     In September 1998, Miller informed Lewis that SDIC's investment could be increased by an additional $500,000, bringing SDIC's total investment in the CTP up to $2,659,000. Lewis raised the additional $500,000 from investors, and he transferred the funds to Miller.

31.     Jay Depew was the largest investor in SDIC. Mr. Depew was employed as a controller for a food and beverage company. Mr. Depew reviewed some of the various letters and reports Miller provided to Lewis and testified that, at the time, nothing in those documents caused him to question their authenticity.

32.     In or around December 1998, Lewis formed an entity called Camelback, Ltd. ("Camelback") at Miller's request. Investors were told that, to remain with the

program, they had to become a Camelback stockholder – otherwise their principal would be returned to them.

33.     In a memorandum to the SDIC partners dated December 16, 1998, Lewis stated that he expected SDIC's profits for 1998 to be $140,246,710.  Lewis wrote that:

> As I computed these figures it was difficult for me to think that such figures could be real.  Then I have to revert back to our contract yield of 9.67%, which is understandable.  Then we re-invest our profit into another contract, and we get the compounding effect, which is, mind-boggling.

34.     All investors agreed that their partnership interests in SDIC would be exchanged for stock in Camelback.

35.     Throughout 1998, Miller told Lewis that the trades were occurring as scheduled.  All communication regarding the trading program came from Miller, including the location of the funds, the banks involved and the returns.  Lewis, in turn, disseminated this information to the investors.

36.     Miller appeared at IMA meetings in 1997 and 1998.  Miller discussed the CTP with potential investors.[2]  His wife, Sheri, attended at least one meeting in Scottsdale, Arizona.  Sheri also assisted Lewis in connection with his communications to investors regarding the formation of Camelback.

37.     The first distribution from JP Morgan Bank was to occur in April 1999.  However, in late March 1999, Miller told Lewis that "Weldon," at attorney for JP Morgan Bank in Geneva, was asking questions about SDIC.  Miller told Lewis that the bank suspected SDIC was an investment group rather than an accredited investor qualified to participate in the CTP.  Miller told Lewis that SDIC's investments could be "defaulted" by the bank because SDIC was an investment club, not an "accredited

---

[2] Miller's testimony that Lewis told him not to speak with investors regarding the CTP was not credible.

investor" that met a net worth qualification requirement.  In April 1999, Miller told Lewis that JP Morgan Bank would not allow Miller to distribute any funds to SDIC.

38.     In May 1999, Miller told Lewis he was working with JP Morgan Bank to get IMA or SDIC qualified as an accredited investor in the CTP.  Miller told Lewis that if the bank decided IMA could not be qualified, then it could declare a breach of contract and a "takeout" would be the only option.

39.     In June 1999, Miller forwarded Lewis a fax that purported to be from JP Morgan Bank.  The document stated that SDIC's account was in default, that SDIC must provide the bank with certain documents within a specified time, and that failure to provide the documents could result in "severe penalties."

40.     Over the next few months, Miller continued to tell Lewis that he was working with JP Morgan Bank and that he was trying to arrange of "takeout" of SDIC by other investors.

41.     In November 1999, Lewis demanded proof of SDIC's account at J.P. Morgan.  Miller provided a letter purportedly from the office of Phillipe Pretti at J.P. Morgan acknowledging an account in Geneva, Switzerland.  Miller told Lewis that the name "Phillipe Pretti" was a security code and that anyone using that name would be identified with Miller's CTP.

42.     In February 2000, Lewis and Mr. Depew traveled to Geneva, Switzerland, to meet with Weldon and gather information regarding SDIC's account.  After learning that JP Morgan Bank did not employ anyone named Weldon in Geneva, Lewis met with Benoit Dumont, the managing director and general manager in Geneva, Switzerland.  Mr.

Dumont referred Lewis to the head of Europe security for JP Morgan bank.  Lewis met with security officials for JP Morgan Bank in London.

43.     When Miller learned of Lewis' trip to Geneva, he sent Lewis a letter stating that Lewis' failure to "keep his head down" had jeopardized the takeout Miller had been trying to arrange.

44.     On or about March 17, 2000, Lewis sent a letter to Miller demanding the return of all the moneys deposited by the SDIC investors.

45.     In May 2000, Miller faxed Lewis an e-mail that supposedly came from a representative of JP Morgan Bank.  The e-mail stated that the bank had decided the account was in default.  Although the bank would ordinarily forfeit the principal, in this case it would wire the principal to M-Corp's account and would assess penalties against Miller at a later date.

46.     No CTP or contract trading program existed, no profits existed and the investor principal was not held on deposit in banks.  The documents presented by Miller to Lewis were falsified.  The statements made by Miller to Lewis regarding the CTP, SDIC's investments, the Certificates of Deposit, and the bank accounts were false.  Miller took the funds provided by Lewis for himself and his family.  Among other things, Miller used the funds provided by Lewis to pay Miller's utility providers, and Miller wrote many large checks to himself, to his wife, Sheri, and to Angie Miller.

47.     Lewis relied on Miller's false statements by, among other things, investing in the CTP, continuing to recruit investors for the CTP, and encouraging existing investors to increase the amount of their investments.

48.     In or around June 2000, Neal and Sharon Lewis "d/b/a S.D.I.C." commenced a lawsuit in Arizona state court against Norman and Sheri Miller and certain of their business trusts and affiliations.  On or about September 19, 2000, the state court litigation was removed to the United States District Court for the District of Arizona (the "District Court Litigation").

49.     In the District Court Litigation, the Plaintiffs sought to recover the principal of the investment, what they believed to be profits existing from the investment program, and other damages.  The Plaintiffs' complaint asserted claims under Arizona law for breach of contract, constructive trust, fraud, breach of fiduciary duty, consumer fraud, conversion and fraudulent conveyance.  The Plaintiffs also sought a declaration that M-Corp was Miller's alter ego.

50.     In or around April 2002, the Arizona Corporation Commission (the "ACC") began investigating Lewis (an Arizona resident) and his related entities for violations of Arizona security laws.

51.     On or about May 14, 2002, the U.S. Department of Justice filed a criminal complaint against Miller in South Carolina for violations of 18 U.S.C. §§ 1343 and 371.  On that same day, Miller was arrested, confessed to the charges, agreed to plead guilty, and agreed to pay $17 million in restitution.

52.     On May 30, 2002, the Debtors, the Plaintiffs and their respective lawyers executed a Settlement Agreement in connection with the District Court Litigation. The Settlement Agreement provided for the entry of a stipulated judgment in the amount of $9 million.  Accordingly, on June 19, 2002, a Stipulated Judgment was entered resolving the District Court Litigation (the "Arizona Judgment").

53.     The Arizona Judgment provides in relevant part:

> NOW, THERFORE, IT IS ORDERED, ADJUDGED AND DECREED
> that the defendants are liable to plaintiffs for breach of contract,
> conversion, constructive trust, fraud and breach of fiduciary duty in the
> amount of $9,000,000.00.   It is expressly ordered that the Millers
> defrauded Lewis and that this judgement [sic], in its entirety, is not
> dischargeable under any provision of the United States Bankruptcy Code.

54.     Miller understood that the intent of the parties was that the Arizona
Judgment would not be dischargeable in a bankruptcy.   Miller did not inform the
Plaintiffs of the pending criminal action against him.

55.     The Settlement Agreement provided that the Arizona Judgment would be
satisfied by a payment of $4,500,000.  The Millers had already paid $3,000,000 to Lewis,
and the Settlement Agreement provided that they would pay the remaining $1,500,000 in
six annual payments of $250,000 beginning on March 26, 2003. If the Millers failed to
make the required payments, the Settlement Agreement stated that the settlement would
be deemed null and void, and Lewis could record and seek to collect the full $9 million
set forth in the Arizona Judgment.

56.     Miller obtained the $3 million he paid to Lewis pursuant to the Settlement
Agreement from funds he acquired through another fraudulent Ponzi-type scheme.
Miller's testimony that he believed his fledgling publishing business would generate
enough profit to make annual payments to the Plaintiffs in the amount of $250,000 was
not credible.  The Defendants knew when they signed the Settlement Agreement that they
had no lawful means for paying the additional $1.5 million as required by the Settlement
Agreement.

57.     The Settlement Agreement defined the $3 million already paid by Miller
as a "Restitution Payment."   The parties agreed that Lewis would use the $3 million to

pay restitution as ordered by the ACC.  The parties also agreed that no part of the $3 million would be used by Lewis for the payment of any fines levied against him by the ACC for the manner in which he and Miller procured money from individual investors.

58.     In June 2002, Miller pled guilty to the charges filed against him in the South Carolina criminal action.

59.     The Millers defaulted on the Settlement Agreement in the District Court Litigation, paying only the $3,000,000 initial payment.  Of the initial payment of $3,000,000, $2,972,718 was used to repay investors the principal amount of their investment in the CTP as well as to reimburse investors for the amounts they had advanced to Lewis for his legal costs.

60.     In August 2002, Lewis learned of the South Carolina criminal action against Miller and that Miller had pled guilty in that action in June 2002.

61.     On September 30, 2002, the ACC issued an "Order to Cease and Desist, Order of Restitution, Order for Administrative Penalties and Consent to Same by Respondents NETGO, Inc., SDIC Partnership, Camelback, LTD and Neil Dennis Lewis" (the "First Cease and Desist Order").  The First Cease and Desist Order stated that the "NETGO RESPONDENTS," which included Lewis, had violated various Arizona securities laws.  The First Cease and Desist Order acknowledged that Lewis had already paid $2,972,718 in restitution to the investors.  The First Cease and Desist Order required that the additional $1.5 million to be paid under the Settlement Agreement would be distributed to investors, as follows:

> The NETGO RESPONDENTS … shall pay $250,000 to investors pro rata on March 26, 2003, and each anniversary of March 26, commencing on March 26, 2004, until either all investors are paid all interest accrued at

13

the legal rate on their investment or until investors have received additional payments of $1,500,000.

62.    The First Cease and Desist Order further provided that Lewis' obligation to make an additional $1.5 million in restitution payments would be contingent on any receipt of funds from Miller "as a result of settlement of this action or any other action."

63.    At or around the same time, the ACC issued an "Order to Cease and Desist, Order of Restitution, Order for Administrative Penalties and Consent to Same by Respondents Norman Michael Miller and M-Corp International" (the "<u>Second Cease and Desist Order</u>").  The Second Cease and Desist Order asserted that Miller had violated various Arizona securities laws.  Among other things, the Second Cease and Desist Order acknowledged that Miller had already paid $3,000,000 in restitution to investors.  The Second Cease and Desist Order further required Miller to pay the remaining $1.5 million as follows:

> Payment shall be made in the amount of $250,000 to investors pro rate on March 26, 3003, and each anniversary of March 26, commencing on March 26, 2004, until either all investors are paid all principal and interest accrued at the rate of ten percent per annum on their investment or until all investors have received total payments of $4,500,000.  Payment shall be made to the trust fund of David T. Bonfiglio, to be distributed by that attorney to the investors.

64.    IMA's membership fluctuates each year.  In 2002, IMA had 44 members. IMA's membership dropped to 30 in 2003 and has declined during each subsequent year. Lewis has been unable to recruit new members since approximately 2000.  IMA's membership declined to 17 active members in 2006.

65.    In February 2003, the Arizona Better Business Bureau suspended IMA's membership.

66.     The Defendants filed a petition for relief under Chapter 7 of the Bankruptcy Code on November 22, 2004.  The Defendants scheduled the Plaintiffs' claim as a community obligation, identifying the claim in their schedules as a "disputed" judgment.  The amount of the claim is listed as $6 million.

67.     On March 16, 2005, the Plaintiffs' filed Proof of Claim No. 1 and Proof of Claim No. 2 against the Defendants.  In their claims, the Plaintiffs' assert that the balance due and owing of the Arizona Judgment as of the date of Defendants' bankruptcy was $7,572,279 in principal and interest.

68.     On April 5, 2006, the ACC filed a claim against the Defendants in the amount of $2,014,569.18.  The Chapter 7 trustee has objected to the ACC's claim as untimely and as failing to attach any supporting documentation.

69.     The Defendants objected to the Plaintiffs' claims on the grounds that (1) the Plaintiffs had submitted insufficient documentation; and (2) the Defendants do not owe any money to the Plaintiffs.  The Court scheduled the claims objections to be tried with the dischargeability Complaint pursuant to the "Order Regarding Debtors' Objection to Claim No. 1 of Neil Lewis and Sharon Lewis and Debtors' Objection to Claim No. 2 of Neal Lewis and Sharon Lewis" entered on December 11, 2006.

## CONCLUSIONS OF LAW

### A. <u>Jurisdiction</u>

1.     This Court has jurisdiction to consider the Defendants' objection to the Plaintiffs' claims as well as the Plaintiffs' Complaint pursuant to 28 U.S.C. §§ 1334 and 157(a).[3]  The Court may enter a final judgment regarding the Complaint since the

---

[3]

Complaint constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (I), and (O).  Similarly, the Court may enter a final order regarding the Defendants' objection to the Plaintiffs' claims since the objection constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (B), and (O).

## B. The Real Party In Interest

2.      As an initial matter, the Defendants raise the issue of what they describe as "standing."  The Defendants argue in their trial brief that the claims for recovery asserted by the Plaintiffs belong to the SDIC Partnership and that the SDIC Partnership is the only party that would have standing to make a claim for recovery of partnership assets.  As authority, the Defendants cite a case holding that a partnership claim belongs to and is the specific property of the partnership under Arizona law.

3.      Every action must "be prosecuted in the name of the real party in interest." FED R. CIV. P. 17(a).  "In other words, the action must be brought by the person entitled under governing substantive law to enforce the asserted right."  *Whelan v. Abell,* 953 F.2d 663, 672 (D.C. Cir. 1992).  If it is not, the action may be dismissed, but not until the real party in interest has had a reasonable opportunity to join the action, after an objection has been made to its being prosecuted by the party that originally brought it.  FED R. CIV. P. 17(a).  Federal Rule 17(a)'s reference to an objection indicates that the challenge "is in the nature of an affirmative defense ...." 6A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1554 (2nd ed.1990).  *See also, Whelan,* 953 F.2d at 672.  As such, it is an issue that "is waived when it is not timely asserted." *In re Unger & Assoc. Inc.,* 292 B.R. 545, 552 (Bankr. E.D. Tex. 2003).

4.    Here, the District Court Litigation was pending in a federal court. The Defendants could have raised the issue of whether the Plaintiffs were the real parties in interest with respect to the claims asserted therein pursuant to Federal Rule 17 but did not do so.  The Arizona Judgment was in favor of the Plaintiffs.  The Defendants consented to the entry of the Arizona Judgment and paid the Plaintiffs $3 million pursuant to the Settlement Agreement.   The Defendants did not appeal the Arizona Judgment, which became final and is now insulated from collateral attack.  *See, e.g., Insurance Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n. 9 (1982);*, Royal Ins. Co. of Am. v. Quinn-L Capital Corp.,* 960 F.2d 1286, 1293 (5th Cir. 1992); *Mitchell v Comm'n on Adult Entm't Establishments*, 12 F.3d 406, 409 (3d. Cir. 1993).

## C. Defendants' Objections to Plaintiffs' Claims

5.    A proof of claim, if it is executed and filed in accordance with the Federal Rules of Bankruptcy Procedure, constitutes *prima facie* evidence of the validity and amount of that claim.  FED. R. BANKR. P. 3001(f); *Matter of Fidelity Holding Co.,* Ltd., 837 F.2d 696 (5th Cir. 1988). Rule 3001 generally sets forth the requirements for filing a proof of claim, and one of those requirements states that:

> when a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim.  If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

FED. R. BANKR. P. 3001(c).  Likewise, if a creditor claims a security interest in property of the debtor, Rule 3001(d) requires the creditor to accompany his proof of claim with evidence that the creditor perfected a security interest.

6.    The burden of persuasion under the bankruptcy claims procedure always lies with the claimant, who must comply with Bankruptcy Rule 3001.  If the claimant

satisfies the requirements of Bankruptcy Rule 3001, the burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objecting party meets this evidentiary requirement, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence.  *See In re Consumers Realty & Dev. Co.*, 238 B.R. 418 (B.A.P. 8th Cir. 1999); *In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).

7.     Here, the Plaintiffs' timely executed and filed Proofs of Claim Nos. 1 and 2, which are identical.  Each claim is in the amount of $7,572,279 and states that it is based on a judgment obtained on June 18, 2002.  The Plaintiffs attached a certified copy of the Arizona Judgment to each claim, an itemization explaining the claim amount, and a "Notice of Filing Foreign Judgment" dated October 1, 2003, from the District Clerk for Collin County, Texas.

8.     The Plaintiffs' itemization of the claim amount lists the $9 million Arizona Judgment, a credit for the pre-judgment payment of $3 million by the Defendants, and interest that has accrued since the entry of the Arizona Judgment.

9.     The Defendants' objection that Claim Nos. 1 and 2 were "filed with insufficient supporting documentation for the basis of the claim and the alleged claim amount documentation" is without merit.

10.     Claim Nos. 1 and 2 are duplicative.  The Plaintiffs have only one claim against the Defendants' estate.  Thus, Claim No. 1 should be stricken.

11.     The remainder of the Defendants' objection is that they do not owe any money to the Plaintiffs.  This objection is based on the arguments presented in connection with their opposition to the Plaintiffs' Complaint.  For the reasons stated below, the Court finds and concludes that the Plaintiffs have a claim against the Defendants, and the Plaintiffs' claim is not dischargeable.

### D. <u>Plaintiffs' Objections to Dischargeability</u>

12.     In the adversary proceeding, the Plaintiffs assert that the Defendants' liability under the Arizona Judgment may not be discharged in bankruptcy pursuant to §§523(a)(2)(A), (a)(4) and/or (a)(6) of the Bankruptcy Code.  Together, these sections of the Bankruptcy Code implement the long-standing policy that only those debts which are honesty incurred are entitled to the benefits of a bankruptcy discharge.  *See, e.g., FTC v. Austin (In re Austin),* 138 B.R. 898, 903 (Bankr. N.D. Ill. 1992).

13.     The Plaintiffs have the burden of proof under a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).  Thus, without satisfactory proof of each element of the cause of action, judgment must be entered for the Defendants.

#### *(1) 11 U.S.C. §§ 523(a)(2)(A)*

14.     Section 523(a)(2)(A) of the Bankruptcy Code provides that:

[A] discharge under §727 . . . of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

15.     The phrase "to the extent obtained by" in § 523(a)(2)(A) does not impose any limitation on the extent to which "any debt" arising from fraud is excepted from discharge.  Once it is established that specific money or property has been obtained by fraud or false pretenses, any debt arising therefrom is excepted from discharge.  *See Cohen v. de la Cruz,* 523 U.S. 213, 218 (1988).

16.     To prove that a debt is non-dischargeable as having been obtained by a false pretense or representation, a creditor must establish (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, and (iii) that was relied upon by the creditor.  *See Alison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991); *RecoverEdge L.P.* at 1292-93.

17.     Actual fraud requires the additional proof of the debtor's intent to deceive and a loss by the creditor which is proximately caused by the fraud.  *See RecoverEdge L.P.* 44 F.3d 1284, 1293 (5th Cir. 1999).

18.     In this case, the Arizona Judgment is an admission by the Defendants of a debt to the Plaintiffs.  A debt embodied in the settlement of a fraud case arises out of the underlying fraud.  *See Archer v. Warner*, 538 U.S. 214, 322 (2003).

19.     When deciding whether to give preclusive effect to a federal diversity judgment such as the Arizona Judgment, this Court must apply the issue preclusion rules that would be applied by state courts in the State in which the federal diversity court sits. *See Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373 (1996).  Here, because the underlying judgment was entered by an Arizona federal court, Arizona rules of issue

20

preclusion apply. *See Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 507, 510 (2001).

20.    Under Arizona law, the doctrine of collateral estoppel or issue preclusion is "applicable when the issue or fact to be litigated was actually litigated in a previous suit, a final judgment was entered, and the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter and actually did litigate it, provided such issue or fact was essential to the prior judgment." *Chaney Building Co. v. City of Tucson*, 716 P.2d 28, 30 (Ariz. 1986).

21.    Arizona law defines an "actually litigated issue" as one which "is properly raised by the pleadings or otherwise, and is submitted for determination, and is determined." *Chaney*, 716 P.2d at 30 (relying on Restatement (Second) of Judgments §27, Comment d).  Although none of the issues is actually litigated in the case of a judgment entered by consent, the Arizona Supreme Court has indicated that it will enforce the intent of the parties if the judgment or record indicates that an issue should be deemed conclusively established. *See id.*

22.    Here, the complaint filed by the Plaintiffs in the District Court Litigation contained detailed factual allegations supporting the Plaintiffs' claims.  The Defendants had a full opportunity to litigate the Plaintiffs' claims.  The case had been pending for nearly two years when the parties entered into the Settlement Agreement.  The Arizona Judgment, which was entered with the Defendants' consent pursuant to the Settlement Agreement, is a final judgment.

23.    The parties did not intend for the Defendants to be able to discharge their obligation under the Arizona Judgment by filing a petition for relief under the

Bankruptcy Code.  Indeed, the Arizona Judgment expressly states that the Defendants are liable to the Plaintiffs for fraud, among other things, and that the judgment is not dischargeable under any provision of the Bankruptcy Code.

24.    A claim for fraud under Arizona law mirrors the elements of §523(a)(2)(A) of the Bankruptcy Code.  To establish common law fraud under Arizona law, a party must prove the following: (1) a representation, (2) its falsity, (3) its materiality, (4) the communicating party's knowledge of its falsity or ignorance of its truth, (5) the communicating party's intent that it be acted upon by the recipient in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the right to rely on it, and (9) his consequent and proximate injury.  *Echols v. Beauty Built Homes, Inc.,* 500, 647 P.2d 629, 631 (Ariz. 1982).  In order to establish "the right to rely" on the statement, a plaintiff must show that he was justified in his reliance on the alleged misrepresentation.  *Medical Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.,* 30 F.Supp.2d 1182, 1201 (D. Ariz. 1998) (citing *Ness v. Western Sec. Life Ins. Co.,* 174 Ariz. 497, 851 P.2d 122, 127 (Ariz. App.1992)).  However, a plaintiff need not establish a "right to rely" on the statement if reliance was reasonable.  *Ness*, 851 P.2d at127.

25.    The Defendants, having previously stipulated to a judgment for fraud under Arizona law, are precluded from now arguing that Lewis' reliance on Miller's representations is not justifiable.  Justifiable reliance is an element of common law fraud under Arizona law.  *See, e.g., Medical Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.,* 30 F.Supp.2d at 1201.

22

26.    The Defendants, having previously stipulated to liability to the Plaintiffs in the amount of $9 million, are precluded from objecting to the agreed-upon amount of the Plaintiffs' damages.  By specifically stipulating to the issue of liability for fraud (among other things) in the Arizona Judgment, the parties intended to collaterally estop further litigation on this issue.

27.    In light of the clear statement in the Arizona Judgment that it would not be dischargeable in bankruptcy, and in light of Miller's testimony regarding the parties' intent in connection with the Arizona Judgment, the Court further finds and concludes that the parties intended to allocate the full amount of the Arizona Judgment to the potentially non-dischargeable claims for fraud, breach of fiduciary duty and conversion. The damages associated with the dischargeable claim for breach of contract is included within the Arizona Judgment.[4]

28.    The Defendants' argument that their liability to the Plaintiffs' is less than $9 million is clearly inconsistent with the position they took in the District Court Litigation.  The Arizona court relied on the parties' representation regarding the amount of the Defendants' liability in entering the Arizona Judgment.  The Defendants would derive an unfair advantage and impose an unfair detriment on the Plaintiffs if not estopped from taking a position on liability that is clearly inconsistent with the Arizona Judgment.  *See Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (discussing the bases for judicial estoppel).

29.    Even if the Court had concluded that the Defendants were not collaterally estopped on certain issues by the Arizona Judgment, the evidence presented at trial

---

[4] The only other grounds for liability set forth in the Arizona Judgment is "constructive trust." The imposition of a constructive trust is an equitable remedy under Arizona law.  *See, e.g., Linder v. Lewis*, 333 P.2d 286 (Ariz. 1958).

clearly established that Miller lied to Lewis regarding the existence and activities of the CTP. Lewis relied on Miller's false representations by, among other things, encouraging members of the IMA to invest with Miller in the purported CTP. Miller intended to deceive Lewis and did, in fact, deceive Lewis and the other investors. As a proximate result of Miller's false representations, the money supposedly invested with Miller was lost, Lewis and the other investors did not receive any return on their investment, Lewis suffered damage to his personal reputation as well as the reputation of his business, and Lewis incurred significant legal costs.

30. Additionally, at the time the Defendants entered into the Settlement Agreement, they had no intention of abiding by it. This was a false representation of fact which the Plaintiffs justifiably relied upon and, as such, constituted fraud within the meaning of §523(a)(2)(A) of the Bankruptcy Code. Further, the Defendants use of funds obtained by fraud to make the initial $3 million settlement payment may have exposed the Plaintiffs to additional liability. The Plaintiffs may recover as damages the difference between what they actually received from the Defendants and the full amount of the Arizona Judgment.

31. For the foregoing reasons, the Court concludes that the Plaintiffs have established the elements of a claim for "false pretenses and false representations" and "actual fraud" under §523(a)(2)(A) of the Bankruptcy Code. Accordingly, the Defendants' remaining liability to the Plaintiffs under the Arizona Judgment is not dischargeable in bankruptcy.

32. Having found that the Defendants' obligation to the Plaintiffs should not be discharged in bankruptcy §523(a)(2)(A), it is not necessary for the Court to discuss the

remainder of the Plaintiffs' objections to the discharge of the Defendants' obligation to them.  The Court, however, will address the Plaintiffs' remaining objections in order to provide the parties with a full discussion of the issues presented at trial.

### *(3) 11 U.S.C. §523(a)(4)*

33.    A claim involving a debtor's fraud or defalcation while acting in a fiduciary capacity is excepted from discharge by §523(a)(4) of the Bankruptcy Code, as follows:

> A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt –
>
>> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

11 U.S.C. §523(a)(4).

34.    In determining whether a particular debtor was acting in a fiduciary capacity for purposes of section §523(a)(4), the Court must look to both state and federal law.  While the scope of the concept of fiduciary under §523(a)(4) is a question of federal law, state law is important in determining whether or not a trust obligation exists.  *See LSP Investment Partnership v. Bennett*, 989 F2d. 779, 785 (5th Cir. 1993).

35.    The Fifth Circuit has recently discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law.   Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts.   The purported trustee's duties must, therefore, arise independent of any contractual obligation.  The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong.  Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).

Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4).  It is not enough, however, that a statute purports to create a trust:  A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary."  Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable *res* and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 - 43 (5th Cir. 1998).

Thus, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

36.    Under Arizona law, a fiduciary relationship may be implied when there is "great intimacy, disclosure of secrets, intrusting of power, and superiority of position." *Securities and Exchange Comm'n v. Rauscher Pierce Refsnes, Inc.,* 17 F.Supp.2d 985, 992 (D. Ariz. 1998) (citation omitted).  A financial advisor, for example, can be a fiduciary when it offers advice regarding the issuance of finance instruments, management of interest rates, and debt payments.  *Id.*  Additionally, an attorney in fact who serves as an agent for his co-investors has fiduciary duties to them as his principals. *Valley Nat'l Bank of Phoenix v. Milmoe*, 248 P.2d 740 (Ariz. 1952).  "The duty of an agent to make full disclosure to his principal of all material facts relevant to the agency is fundamental to the fiduciary relation of principal and agent." 3 Am.Jur. Agency s 200 (1962).

37.    In this case, Lewis entrusted funds to Miller for investment in what Lewis believed to be a high yield investment program.  Miller held himself out as a registered agent for the investment of funds – he even included the descriptions "registered agent" or "attorney in fact" below his signature on some of his correspondence to Lewis.  Miller established further credibility with Lewis by joining his organization, the IMA, and by

pretending to help Lewis get his funds back from another CTP when, in fact, there was no such CTP.  Miller also falsified documents bank statements and Certificates of Deposit relating to the SDIC's investment in the purported CTP.

38.     Miller defrauded Lewis while acting in a fiduciary capacity by the Defendants' own admission.  The Defendants stipulated to the entry of the Arizona Judgment against them for fraud, constructive trust, and breach of fiduciary duty, among other things.  Further, Miller consented to the entry of the Second Cease and Desist Order in connection with his violations of Arizona securities laws.

39.     The Defendants' argument that they were merely constructive trustees as a result of the Arizona Judgment is without merit.  The fiduciary relationship between the Plaintiffs and the Defendants existed prior to the entry of the Arizona Judgment.  Under Arizona law, courts may impose a constructive trust if, as in this case, there has been a breach of fiduciary duty.  *See, e.g., Turley v. Ethington*, 146 P.3d 1282, 1285 (Ariz. App. 2006).

40.     Even if the Defendants were not collaterally estopped on certain issues by the Arizona Judgment, the preponderance of the evidence establishes grounds for nondischargeability under §523(a)(4).  *See In re Young*. 23 B.R. 484 (Bankr. W.D. Mo. 2005) (debtor who pled guilty to criminally fraudulent conduct in operating livestock operation as Ponzi scheme was collaterally estopped from contesting nondischargeability of resulting debts).  Miller held himself out to Lewis as a registered agent for the investment of funds and advised Lewis with respect to investing in what Miller described as a CTP.  The SDIC partners entrusted Lewis with funds that were to be invested with Miller in a CTP.  Lewis entrusted the funds to Miller.  Instead of investing the funds in a

CTP, Miller appropriated the funds for his own use, and the circumstances surrounding Miller's appropriation of the funds indicate fraud.  Miller's wife, Sheri, assisted him in connection with his scheme.

41.     For all of the foregoing reasons, the Court finds and concludes that the Plaintiffs have sustained their burden of proof on a claim relating to §523(a)(4).

### *(2) 11 U.S.C. §523(a)(6)*

42.     Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

43.     Although conversion of another's property may constitute a willful and malicious injury precluding discharge under §523(a)(6), not all conversions of property are willful and malicious.  This is the holding of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 245 (1986), where the U.S. Supreme Court stated:

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception ….  But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances ….There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacitates removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

44.     More recently, the Fifth Circuit has explained that an injury is "willful and malicious" within the meaning of §523(a)(6) "where there is either an objective substantial certainty of harm or a subjective motive to cause harm."  *In re Miller,* 156 F.3d at 606.

45.     Here, the Arizona Judgment includes a determination of the Plaintiffs' claim against the Defendants for conversion.  As the Court has previously discussed, the Defendants had a full opportunity to litigate the Plaintiffs' claims in the District Court

Litigation, including the Plaintiffs' claim for conversion. The Arizona Judgment is a final judgment and, as such, has preclusive effect in this adversary proceeding.

46.     Arizona law on the tort of conversion stems from the seminal case of *Shartzer v. Ulmer*, 333 P.2d 1084 (Ariz. 1959), which defined conversion as "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Id.* at 1088. The intent required is not necessarily a matter of conscious wrongdoing. *Sterling Boat Company, Inc. v. Arizona Marine, Inc*, 653 P.2d 703 (Ariz. App. 1982). The required intent is an intent to exercise a dominion or control over the goods which is in fact inconsistent with plaintiff's rights. *Id.* Thus, the Arizona Judgment does not establish the requisite intent for purposes of §523(a)(6) of the Bankruptcy Code.

47.     However, both the Arizona Judgment and the evidence presented at trial establish that Miller misappropriated property entrusted to him by Lewis for his own use. It is clear from the evidence presented at trial that Miller did not intend to repay Lewis or any of the other participants in Miller's alleged CTP. Rather, Miller used Lewis to recruit "investors" for Miller's Ponzi-type scheme. Miller intended to harm Lewis and did, in fact, do so. Under the circumstances, Miller's conversion of the funds obtained from Lewis was willful and malicious within the meaning of §523(a)(6) of the Bankruptcy Code.

48.     Additionally, the Defendants' failure to fulfill their obligations under the Settlement Agreement was willful and malicious within the meaning of §523(a)(6). The Defendants used funds obtained through defrauding others to make the initial settlement payment to the Plaintiffs. The Defendants knew when they signed the Settlement

29

Agreement they had no lawful means of obtaining funds for the additional payments required by the Settlement Agreement. Likewise, Miller knew when he signed the Consent Judgment with the ACC that he had no lawful means of making the required payments to Lewis. The Defendants intended to breach the Settlement Agreement and intended to cause the consequences the Plaintiffs have suffered as a result of their non-payment, including Lewis' continuing liability under his Consent Judgment with the ACC.

49.     With respect to damages, as previously discussed, the Plaintiffs may recover the difference between what they actually received from the Defendants and the full amount of the Arizona Judgment.

50.     For the foregoing reasons, the Court finds and concludes that the facts of this case support an exception of the debt owed by the Defendants to the Plaintiffs from discharge pursuant to §523(a)(6) of the Bankruptcy Code.

## CONCLUSION

A fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor." *Grogan,* 498 U.S. at 286-87. Here, the Defendants are neither honest nor unfortunate. The Court will enter a judgment consistent with the foregoing findings and conclusions.

To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings as necessary or as requested by any party.

Signed on 2/21/2007

*Brenda T. Rhoades*     MD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

30